AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br> )<br>TextNow Inc., Attn: C/O CSC )<br>2710 Gateway Oaks Dr, Ste 150 Sacramento, CA 95833 )<br>Re: Account Email "sdclear2black@gmail.com" ) | Case No.   '22  MJ0720 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 841(a), 841(b) | Distribution of Controlled Substance Resulting in Death, Distribution of Controlled |
| 21 USC secs. 841(a), 846 | Substance |
| | Conspiracy to Distribute Controlled Substance |

The application is based on these facts:

See Attached Affidavit of DEA Task Force Officer Jacob Wisler, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Task Force Officer Jacob Wisler, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means)*.

Date:   **Feb 24, 2022**
_____

_____
*Judge's signature*

City and state:  San Diego, CA
_____

Hon. Barbara L. Major, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF WARRANT FOR TEXTNOW ACCOUNT

I, Jacob Wisler, Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), having been duly sworn, hereby state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant in furtherance of a narcotics trafficking investigation conducted by the DEA for TextNow Inc. as described in Attachment A, to search for the TextNow account associated with the following:

> Account Holder:    Thomas Cole SALAZAR aka "Charles Brown"
> Account Number:  (442) 325-0463
> Account Email: sdclear2black@gmail.com
> (The "Target Account")

2.      On December 06, 2021, a TFO associated with this investigation served an administrative subpoena (# R2-22-067001) on TextNow's registered agent, "Corporation Services Company." That subpoena requested subscriber information, message logs, and call logs for the account linked with telephone number 442-325-0463 between the period of August 1, 2020 and January 15, 2021. In response, TextNow, through its registered agent, provided that the account for telephone number 442-325-0463 was formerly subscribed to "Charles Brown" with an email address of "sdclear2black@gmail.com."

3.      The Target Account is linked to Thomas Cole SALAZAR, whom investigators believe is in possession of information relevant to an ongoing prosecution of two individuals—Cole SALAZAR and Valerie ADDISON — for various charges including distribution of fentanyl resulting in death, possession with intent to distribute fentanyl, heroin and methamphetamine, and conspiracy to distribute fentanyl. It is believed that the Target Account contains data and information evidencing communications by SALAZAR in furtherance of his drug-trafficking activities.

4.      Based on my experience and training, and all the facts and opinions set forth

in this affidavit, I submit this affidavit in support of the application to search the Target Account for, and to seize, as they pertain to violations of Title 21, United States Code, Sections 841(a), 841(b), and 846—Distribution of Fentanyl Resulting in Death, Possession with Intent to Distribute Fentanyl, Heroin and Methamphetamine, and Conspiracy to Distribute Fentanyl, all communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data (and all other documents and records as more fully set forth in Attachment B):

a. tending to indicate efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

b. tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

d. tending to identify travel to or presence at locations involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

e. tending to identify the user of, or persons with control over or access to, the Target Account;

f. tending to identify means and sources of payment for services (including any credit card or bank account numbers or digital money transfer account information); or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

## **EXPERIENCE AND TRAINING**

5.     I am a peace officer employed as a District Attorney Investigator (DAI) by the San Diego County District Attorney's Office, Bureau of Investigation and have held such employment since September 2019.  I am assigned to the Major Narcotics Division. During this time, I have primarily investigated cases involving the trafficking of controlled substances such as heroin, cocaine, methamphetamine, and fentanyl. I have directed and participated in hundreds of drug investigations regarding the illegal acquisition and/or distribution of controlled drugs and effected or participated in more than 500 arrests for violations of the California Health & Safety Code and Title 21 of the United States Code.

6.     Prior to my employment as a DAI, I was employed as a peace officer with the La Mesa Police Department (LMPD) from January 2007 until September 2019.  While at the LMPD, I worked as a patrol officer for two years. I was a detective assigned to the Special Investigations Unit (SIU) for over four years.  I was assigned as a gang investigator and federally cross-sworn Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), East County Regional Gang Task Force (ECRGTF) for four years.  I was also assigned as a TFO with DEA NTF Team 2 for approximately three years.

7.     I have conducted investigations involving residences that have been identified as dealing in narcotics including fentanyl and have been present during the surveillance of these residences that have been identified as dealing in narcotics including fentanyl.  I am familiar with the patterns associated with the trafficking of narcotics including fentanyl as practiced locally.  I have become familiar with narcotics slang and jargon as it pertains to the sales and transportation of narcotics including fentanyl.  I have been involved in over 500 arrests for person involved in possession of drugs for sale, and 500 arrests of persons for the possession of controlled substances, including fentanyl.  I have testified as a narcotics sales expert over 15 times in Superior Court in the County of San Diego.

8.     I am also a duly appointed Task Force Officer (TFO) of the Drug Enforcement Administration (DEA), currently assigned to the DEA San Diego Field Division (SDFD), San Diego, California.  I have been assigned as a DEA TFO since 2017. As a TFO, I am authorized to swear out complaints and search warrants for violations of federal law, including violations of Title 21 of the United States Code.

9.     I am currently assigned to DEA SDFD's San Diego County Integrated Narcotic Task Force (NTF) Team 10 and have been since March 2020. NTF Team 10 is comprised of DEA Special Agents (SAs), Task Force Agents (TFAs) from Federal Bureau of Investigation and Department of Homeland Security – Homeland Security Investigations, and Task Force Officers from San Diego Police Department and Department of Health Care Services. NTF Team 10 primarily investigates illegal drug trafficking organizations operating in the United States and internationally, including those DTOs whose operations involve the distribution of wholesale quantities of fentanyl, oxycodone, hydrocodone, alprazolam, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, heroin and hashish in and around the San Diego, California area.  The primary focus of NTF Team 10 is the investigation of fatal drug overdoses.

10.     I am familiar with narcotic controlled substances, including heroin, methamphetamine, cocaine, marijuana, fentanyl and prescription pharmaceutical drugs.  During the course of my career, I have become familiar with information about how criminals use telephones to plan and carry out crimes, communicate with coconspirators, dispose of evidence, and escape prosecution.  I am familiar with how drug dealers and drug users use telephones to arrange meetings and sales of controlled substances, as well as to coordinate the planning and execution of other types of crimes including identity theft.

11.     In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical and electronic surveillance, and executing search

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

and arrest warrants. I have interviewed defendants and witnesses while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers.

12. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics traffickers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics trafficking generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, and phone numbers of co-conspirators. Further, because people engaged in narcotics trafficking rely on cellular telephones, location information about their phones generates evidence as well, such as information showing where and when they met and locations relevant to their activity.

13. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit that drug traffickers rely on cellular telephones because they are integral to their trafficking activity. For example, drug traffickers will use cellular telephones for the following reasons:

    a. Drug traffickers and their co-conspirators will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers and their co-conspirators will use cellular telephones because they are able to communicate about the movement of drugs, such as when a source of supply is bringing drugs for them, when they are bringing drugs to a co-conspirator.

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

c.  Drug traffickers and their co-conspirators will use cellular telephones because they are able to use them to arrange the acquisition of drugs from sources of supply, and can arrange transactions with purchasers,

d.  Drug traffickers and their co-conspirators will use cellular telephones because they are able to use them to manage the movement of related funds, such as funds that are the proceeds of their activity and funds used to pay for drugs.

e.  Drug traffickers and their co-conspirators will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units.

14.  The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.  Dates, times, and amounts are approximate.

## FACTS SUPPORTING PROBABLE CAUSE

15.  This affidavit seeks authority to search the Target Account, a TextNow account associated with Cole SALAZAR, a defendant presently indicted in case 21-CR-3518-CAB on various charges including distribution of fentanyl resulting in death, possession with intent to distribute fentanyl, heroin and methamphetamine, and conspiracy to distribute fentanyl. Sarah FUZZEL is the victim of an overdose death in November 2020, where it is suspected that defendant Cole SALAZAR communicated with FUZZELL to arrange and facilitate drug transactions.

16.     On November 7, 2020, at approximately 1:45 p.m., San Diego County Sheriff's Department (SDSD) Deputies responded to a report of an unresponsive female inside of her apartment in Vista, California. Deputies arrived at the residence and a few minutes later pronounced FUZZELL (a twenty-four year old woman) deceased. Deputies interviewed the reporting party who stated he was FUZZELL's neighbor and that he last saw FUZZELL on November 3, 2020. The reporting party was contacted by FUZZELL's father on November 7, 2020, who asked the reporting party to check on FUZZELL, which resulted in the reporting party discovering FUZZELL unresponsive in her bed and calling 9-1-1.

17.     In the apartment, SDSD Deputies found an assortment of prescribed medications, numerous alcohol containers, a bong, burnt foil, and two small clear plastic baggies with nothing inside of them. The burnt foil and a baggie presumptively tested positive for the presence of fentanyl. The San Diego County Medical Examiner's Office (MEO) conducted their own investigation and performed an autopsy on November 8, 2020. The MEO determined FUZZELL died as the result of the toxic effects of fentanyl and alprazolam.

18.     Among FUZZELL's possessions in her apartment when she was found deceased was an Apple iPhone. That Apple iPhone was recovered by FUZZELL's father and was given to Team 10. FUZZELL's father told Team 10 that the Apple iPhone belonged to FUZZELL and that he believed the phone contained possible elicit communications with unknown narcotics dealers.

19.     Team 10 began an investigation into the death of FUZZELL to determine from whom FUZZELL procured the fatal dose of drugs. Based on a review of FUZZELL's Apple iPhone, investigators learned that FUZZELL initially communicated with SALAZAR in early August 2020 via the "LetGo" app, now owned by "OfferUp." FUZZELL communicated by email with "dabbintartar@gmail.com" (believed to be

utilized by SALAZAR) using subject line "Roofing Tar." Drug dealers often use coded language, such as "roofing tar" meaning black tar heroin, in an attempt to avoid scrutiny by law enforcement.

20.   Team 10 investigators obtained a forensic download of FUZZELL's cell phone. In reviewing FUZZELL's phone download, Team 10 investigators reviewed subsequent text communications between FUZZELL and SALAZAR. SALAZAR was using "TextNow" for his phone service with a telephone number ending in digits 0463 from at least October 5, 2020, through November 3, 2020. Based on the continuing messages between FUZZELL and SALAZAR, it appears as though SALAZAR was supplying fentanyl and/or heroin to FUZZELL throughout that time period, and until the final transaction between them on November 3, 2020, which resulted in FUZZELL's death.

21.   As described in further detail throughout this affidavit, Team 10 has reason to believe that the number ending in digits 0463 is associated with a TextNow account that was utilized by SALAZAR during the relevant time period of this investigation. First, SALAZAR sent selfie-style photographs to FUZZELL from that number. SALAZAR indicates in text messages that these photographs are indeed pictures of himself. Team 10 later confirmed that SALAZAR is the person depicted in these photographs by meeting SALAZAR in person. Second, at a controlled buy of narcotics between law enforcement and the person using the number ending in digits 0463, SALAZAR arrived at the planned meet with a phone in his hand. SALAZAR would later admit that he had been using this phone for weeks. During a consensual search of the phone, law enforcement discovered that the TextNow app was being utilized to communicate with FUZZELL. Specifically, the TextNow app on SALAZAR's phone was using an account associated with the number ending in digits 0463. Finally, as mentioned above, the name registered to the Target Account as revealed by administrative subpoena is "Charles Brown." During their initial interactions, SALAZAR introduces himself to FUZZEL from the number ending in digits

0463 with the alias "Charlie." When confronted by law enforcement, SALAZAR does not deny personally knowing and communicating with FUZZELL.

22.    FUZZELL's last communicated with SALAZAR on November 3, 2020 by text message. During a series of messages on November 3, 2020, SALAZAR asked FUZZELL if she knew anyone with money because he had "real blue roxi 30s." "Roxi 30s," also known as Roxicodone 30 mg tablets, or oxycodone 30 mg tablets, are commonly abused Schedule II opioid pharmaceutical pills, and counterfeits of these pills often contain fentanyl instead of oxycodone and are referred to as "blues," "Roxies," "M30s," etc. Later in the conversation, FUZZELL indicated to SALAZAR that she was dope-sick and needed drugs. SALAZAR asked FUZZELL, "u are talking the tickets to Fenway park the Fairy dust." FUZZELL replied, "Yes I'd much prefer Fenway park  But I'm desperate so." Investigators believe that "Fenway park" and "fairy dust" are references to fentanyl powder. FUZZELL and SALAZAR discussed a location to meet in the Rancho Bernardo neighborhood of San Diego. SALAZAR followed up by sending two "selfie" photographs of himself to FUZZELL

23.    That same day, FUZZELL continued to send text messages to SALAZAR and confirmed they were meeting up at a parking lot in Rancho Bernardo. At approximately 10:55 a.m., FUZZELL messaged SALAZAR, "You there?" At approximately 11:11 a.m., FUZZELL messaged SALAZAR, "If u ever free and in north county come thru and kick it with me at my place." Based on these messages, investigators believe that SALAZAR and FUZZELL met on November 3, 2020 between 10:55 a.m. and 11:11 a.m. to consummate the drug transaction. FUZZELL sent her last message to SALAZAR at 11:27 a.m.

24.    On January 10, 2021, an investigator acting in an undercover (UC) capacity and utilizing the decedent's (FUZZELL) cell phone, sent a text message to SALAZAR requesting "tickets to Fenway." Over the next two days, the UC and SALAZAR exchanged text messages about meeting for the UC to purchase fentanyl and heroin from SALAZAR.

25.     On January 13, 2021, the UC messaged SALAZAR asking if he was available and had the "confetti," a common slang term for fentanyl. SALAZAR responded "Yes," and requested the UC meet him downtown to purchase the drugs. The UC messaged SALAZAR that she parked her car.  Law enforcement observed SALAZAR walking on foot with a female (later identified as Valerie Lynn ADDISON) towards the UC's vehicle. As SALAZAR and ADDISON approached, law enforcement contacted them. SALAZAR confirmed his identity to law enforcement. A search of SALAZAR's person produced approximately 2.6 net grams of black tar heroin, a black substance containing approximately .48 grams of heroin, and a white powdery substance containing approximately .29 grams of fentanyl.

26.     ADDISON told investigators that she was SALAZAR's girlfriend, and that they were walking so that SALAZAR could sell drugs.  ADDISON explained that they were staying in a hotel in her name because SALAZAR had a warrant. ADDISON told investigators that she was to receive the proceeds from SALAZAR's drug transaction. ADDISON gave law enforcement verbal and written consent to search the hotel room.

27.     Investigators performed a consensual search of the hotel room. Inside the hotel room investigators found numerous controlled substances, including the following:

- Three large baggies of crystalline substance, containing approximately 60 grams of methamphetamine (actual), located in the top drawer of a night stand on the left side of the bed next to used foils and two digital scales;

- One small chunk of a white powdery substance, which presumptively tested positive for fentanyl, on top of a functional digital scale located in the top drawer of a night stand on the left side of the bed;

- A white powdery substance inside a piece of aluminum foil packaged within a folded white piece of paper on the TV stand, containing approximately 0.9 grams of cocaine hydrochloride; and
- "Pay Owe" labels and price list for drugs.

28.    Items in both SALAZAR and ADDISON's names, along with male and female type clothing were found within the room.

29.    During a post-Miranda interview, ADDISON admitted she was renting the room at the hotel in her name because SALAZAR had an active felony warrant. ADDISON said SALAZAR was going to sell the drugs he was in possession of to a female friend. ADDISON said SALAZAR was supposed to give her the money from the drug sales, and she was going to deposit the money into her bank account and use the money to continue renting the hotel room. ADDISON said she met SALAZAR a few years ago and he was her drug dealer. ADDISON said she and SALAZAR have been in a dating relationship for a few months.

30.    As a result of the foregoing, ADDISON and SALAZAR were booked into the custody of the San Diego County Sheriff's Department.

31.    At the time of arrest, SALAZAR had a purple Galaxy S9+ cell phone in his hand. ADDISON claimed it was her phone that she allowed SALAZAR to use for the past three days. When Team 10 performed a consensual search of the phone, they discovered that it contained the "TextNow" app and was associated with the Target Account. That is, Team 10 discovered that SALAZAR's phone contained text and call capabilities using the same phone number that the UC had been communicating with, which is the same number FUZZELL contacted to purchase drugs before her death. Over 15 messages on the phone related to the coordination with customers to sell drugs to them. From the information obtained by the administrative subpoena, Team 10 would later uncover that FUZZELL's phone number had 804 contacts with the phone number ending in digits 0463.

32.     Investigators found numerous photographs of evidentiary value saved in this phone including the following: a photograph of a "Ziploc" style baggie containing a white powdery substance; photographs of foil with burnt residue and photographs of pills; photographs of ADDISON and SALAZAR together; screenshots of text messages regarding drug sales and directing the buyer to send payment through Venmo; and a photograph of a receipt from a hotel in ADDISON's name for two guests for the night of October 28, 2020.

33.     During a post-Miranda interview with SALAZAR, SALAZAR said the drugs in the hotel room belonged to him. SALAZAR said ADDISON was renting the room, and they were both staying in the room. SALAZAR stated he had been using the purple Samsung Galaxy S9+ cell phone found in his possession for weeks. SALAZAR said he was walking to sell drugs to his friend when he was contacted and arrested by police. In regards to the investigation of the death of FUZZELL, SALAZAR denied selling FUZZELL fentanyl.

34.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of SALAZAR are likely to be found in a search of the Target Account. More precisely, given the nature of the relationships that FUZZELL had with SALAZAR, I believe a search of the Target Account is likely to reveal information about their activity, such as communications SALAZAR had with FUZZELL and statements tending to reveal the nature of SALAZAR's activity.

35.     In light of the information described in this affidavit, I believe there is a basis to believe SALAZAR was messaging FUZZELL between August 2020 and January 2021 using his TextNow account, and that there is a basis to believe he had an ongoing durg dealer – customer relationship with FUZZELL for months. Given this understanding, I seek

authority to search the Target Account for the time period of June 1, 2020 through January 13, 2021 (the day of SALAZAR's arrest).

36. SALAZAR and ADDISON were indicted in Case No. 21-CR-3518-CAB. The next court date for both SALAZAR and ADDISON is a Status Hearing set for March 25, 2022 at 11:00 a.m. There is a jury trial set for June 6, 2022 at 8:45 a.m.

## INFORMATION REGARDING TEXTNOW

37. TextNow, Inc. is a Canadian technology company that develops and maintains the TextNow app, which is available for download on most iOS and Android mobile devices, PC, and Mac OS. TextNow, Inc. is the parent company of "TextNow Inc." (no comma), a U.S. corporation. The U.S. component has legal control over the data and records of its Canadian parent company and is subject to legal process.

38. The TextNow app provides a Voice over Internet Protocol (VoIP) service that allows users to communicate via text and call over the internet rather than through the traditional cellular telephone network. Users can install and use the app on multiple devices under the same registered account at the same time.

39. When users register an account in the TextNow app they are issued a 10-digit telephone number. Users can communicate with any number in Canada and the United States, including to non-TextNow users who happen to use traditional cellular networks. TextNow may recycle phone numbers from dormant accounts by reassigning previously assigned phone numbers to new, active users. This means that phone numbers may be recycled from dormant user accounts and reassigned to different users' accounts.

40. TextNow has a variety of user types, including free and paid-for services. These services range from free texts and calls (with ads) through any non-cellular data connection from any device, to paid-for texts and calls over the (formerly) Sprint Network with a compatible device using an assigned SIM card.

41.     When registering users, TextNow collects and retains certain information. The data types that are generally available, which will depend on whether it was retained by TextNow and whether the user provided certain optional information, include **Subscriber Data** (Username, Phone number, Name (if available), Email address, Date of birth (if available), Phone ownership from date, Phone ownership to date, Registration IP address with date (if available)); **Message Logs** (transactional record outlining when a TextNow user sent or received a text message and other data); **Content of Text Messages** (may include media that was sent or received or the transcript of the message); **Call Logs** (transactional record outlining when a TextNow user made or received a call); **Content of Voicemails**; **IP Logs** (IP address and its corresponding timestamp, which is not necessarily generated by sending or receiving a text message or call); and **Media Content** (may include images, videos, or voicemails sent or received by TextNow users).

42.     Subscriber data lists the basic account information related to either the provided username or phone number. If a phone number is provided, all the usernames associated to the phone number within the requested timeframe will be provided. If a username is provided, all phone numbers associated to the account within the requested timeframe will be provided. Subscriber data includes the following:

- Username
- Phone number
- Name (if available)
- Email address
- Date of birth (if available)
- Phone ownership from date
- Phone ownership to date
- Registration IP address with date (if available)

43.     It is important to note that subscriber data is provided by the user and not independently verified by TextNow.  Subscriber data may be retained for an indefinite period. TextNow does not retain historical subscriber data; as such, only the most recent version is available.

44.     Message logs are a transactional record outlining when a TextNow user sent or received a text message. They include the date and time the transaction occurred, the direction of the transaction, the contact phone number, and indicate whether the user has deleted the message.

45.     TextNow also retains that content of the text messages. The content of the messages may include media that was sent or received or the transcript of the message.

46.     Message logs are retained for a period of approximately 2 years before they are deleted.

47.     Call logs are a transactional record outlining when a TextNow user made or received a call. They include the call start date and time, the caller and called number, as well as the duration of the call listed in seconds. TextNow also retains the content of voicemails.  Call logs are retained for a period of approximately 2 years before they are deleted.

48.     IP logs contain the IP address and its corresponding timestamp. It is important to note that IP addresses are not necessarily generated by sending or receiving a text message or call. TextNow does not retain port information, and we do not have records of cellphone towers, pings, or other GPS-related data.  IP addresses are retained for a period of approximately 11 days before they are deleted.

49.     Media may include images, videos, or voicemails sent or received by TextNow users. Media will be provided in a separate folder. Each media file will have a unique identifier that will also be listed in the message logs to indicate when each piece

of media was sent or received. Media files may be retained indefinitely for our paid users but are only retained for 30 days for our free users.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

49.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of TextNow are not. It would be inappropriate and impractical for federal agents to search the vast computer network of TextNow for the relevant accounts and then to analyze the contents of those accounts on the premises of TextNow. The impact on TextNow's business would be severe.

50.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Target Account, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of TextNow, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow TextNow to make a digital copy of the entire contents of the account(s) subject to seizure. That copy will be provided to me or to any authorized federal agent.  The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Section II of Attachment B.  Relevant data will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

51.     Analyzing the data to be provided by TextNow requires special technical skills, equipment and software.  It may also be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope

of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The Internet Service Provider ("ISP") does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

52.   Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

53.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages/comments/entries that identify any users of the subject account(s) and any electronic communications sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

54.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## PRIOR ATTEMPTS TO OBTAIN DATA

55.     Having previously obtained consent to search the cellular phone found on SALAZAR's person at the time of his arrest, Team 10 has observed that the Target Account was being utilized by SALAZAR on said phone. Team 10 has also obtained a forensic download of that phone. However, a forensic analysis of the imaged data therein failed to provide any of the TextNow data from that phone because it appears that the TextNow app only fetches the data from a remote server without localizing any of the data. In other words, the data sought by Team 10 is not stored on the phone and therefore cannot be downloaded from the phone. Despite this limitation, Team 10 does have access to FUZZELL's phone and can observe from its forensic download of the imaged data from that phone that there were communications received by FUZZELL from SALAZAR through the Target Account. Still, Team 10 has yet to fully analyze all the TextNow data from the Target Account because it has not been able to do so either via forensic downloads of either SALAZAR's phone or from FUZZELL's phone.

56.     Based on my training and experience, I am aware that certain information and data can be backed up to an individual's TextNow account that may not be present on the cellular phone itself. It is unknown if agents will be able to conduct a more comprehensive search of SALAZAR's cellular phone due to technical limitations. Moreover, searches of that phone to date have not yielded all of the information that I believe exists on the TextNow servers associated with the Target Account. Some of the information contained on the actual cellular phone may coincide with information on the TextNow account. Beyond that, the United States has not attempted to obtain this data by other means.

//

//

## **CONCLUSION**

57.   Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 841(b), and 846, Distribution of Fentanyl Resulting in Death, Possession with Intent to Distribute Fentanyl, Heroin and Methamphetamine, and Conspiracy to Distribute Fentanyl, and will be found in the Target Account at TextNow. to be searched as provided in Attachment A.


JACOB WISLER
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 24th day of February, 2022.


HONORABLE BARBARA L. MAJOR
United States Magistrate Judge

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

TextNow Inc., is an electronic communications service accepting service of process through its registered agent GKL Corporate/Search, Inc., Capitol Mall, Suite 660, Sacramento, CA 95814, in the Eastern District of California.  TextNow Inc. (no comma) is the United States-based location for TextNow, Inc. (with comma) of at 420 Wes Graham Way, 2nd Floor, Waterloo, Ontario, Zip Code N2L 0J6, Canada.

TextNow hosts the following electronic communication accounts that are the subject of this search warrant and application:

Account Holder:    Thomas Cole SALAZAR aka "Charles Brown"
Account Number:  (442) 325-0463
Account Email: sdclear2black@gmail.com
(The "Target Account")

# ATTACHMENT B

## I.   Service of Warrant

The officer executing the warrant shall permit TextNow, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.   Information to be disclosed by TextNow

All subscriber data, call logs, media files, IP address logs, message logs, including the content of the messages, any other files or records associated with the following account:

> Account Holder:   Thomas Cole SALAZAR aka "Charles Brown"
> Account Number:  (442) 325-0463
> Account Email: sdclear2black@gmail.com
> (The "Target Account")

## III.   Information to be seized by the Government

The search of the data supplied by TextNow pursuant to this warrant will be conducted by federal investigators as provided in the "Procedures for Electronically Stored Information to be Searched and Items to be Seized" section of the affidavit submitted in support of this search warrant and will be limited to June 1, 2020, through January 13, 2021, and to the seizure of communications, records, and attachments:

a.   tending to indicate efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

b.   tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to distribute and possess with intent to distribute

controlled substances and the existence of related conspiracy;

    c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

    d.    tending to identify travel to or presence at locations involved in efforts to distribute and possess with intent to distribute controlled substances and the existence of related conspiracy;

    e.    tending to identify the user of, or persons with control over or access to, the Target Account;

    f.    tending to identify means and sources of payment for services (including any credit card or bank account numbers or digital money transfer account information); or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

which are evidence of violations of Title 21, United States Code, Sections 841 and 846.